[Cite as *State v. Linder*, 2016-Ohio-3435.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27788 |
| | |
| Appellee | |
| | |
| v. | APPEAL FROM JUDGMENT |
| | ENTERED IN THE |
| KYLE H. LINDER | COURT OF COMMON PLEAS |
| | COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2014-10-3016 C |

DECISION AND JOURNAL ENTRY

Dated: June 15, 2016

HENSAL, Judge.

{¶1} Kyle Linder appeals an order of the Summit County Court of Common Pleas that denied his motion to suppress. For the following reasons, this Court affirms.

I.

{¶2} On October 5, 2014, J.S. called the police, requesting that someone check on the welfare of his daughter M.B. He told the dispatcher that M.B. had called him earlier that day, saying that she was feeling suicidal and asking him to meet her in the parking lot of a hospital. When he went to the hospital, however, he did not see M.B. or her vehicle. M.B. was addicted to heroin, suffered from mental health issues, and had tried to hurt herself in the past. The police triangulated M.B.'s cell phone signal to near the intersection of North Howard and Cuyahoga Falls Avenue and gave that information to J.S. They also gave him the last number that her cell phone had dialed. When J.S. called the number, the person said that he had seen M.B. with two other people earlier that day when they came over to borrow a gas can. The person also told J.S.

that the people with whom he saw M.B. lived in the 800 block of North Howard Street. J.S., therefore, drove up and down Howard Street looking for his daughter. While he did not see her, he did see her car parked behind a yellow house at 803 North Howard. At that point he called the police again, seeking assistance. The dispatcher relayed all of the information to Officer Matthew Hackathorn.

{¶3} According to Officer Hackathorn, he found the yellow house that J.S. described and confirmed that M.B.'s car was parked behind it. A week earlier, Officer Hackathorn's lieutenant had told him that the yellow house was possibly connected with drug sales and that there were possibly individuals in the house who had felony warrants. Officer Hackathorn, therefore, approached the house with caution. Because of the potential for danger, he requested back-up and began to set up a perimeter around the house. While he positioned himself at one corner, he sent his partner to watch the front of the house. Before back-up arrived, however, a man opened the side door of the house and stuck his head out as if he was looking for someone. When the man saw Officer Hackathorn, his eyes got "about yea big," seemingly shocked to see the officer. Officer Hackathorn told the man not to move, but instead he turned quickly, ran back into the house, and slammed the door behind him.

{¶4} Officer Hackathorn testified that, in light of the information he had received that there could be illegal activity inside the house and the fact that M.B. was suicidal and a drug user, he was concerned that something bad might have happened to her or was about to happen to her. Announcing "[p]olice," he tried the door of the house, but it was locked, so he forced it open so that he could check to see if M.B. was okay. Inside, he encountered Mr. Linder and a woman and asked them where M.B. was. Mr. Linder denied that M.B. was in the house, but the woman indicated that she was upstairs. Because Officer Hackathorn was foremost concerned

about his own safety, he made a protective sweep of the floor before going upstairs. During the sweep, he saw a shotgun and drug paraphernalia in plain view. When he went upstairs to the second floor, he made a protective sweep again, but did not see anything notable. He then went up to the third floor where he found M.B. hiding in a cubbyhole. According to Officer Hackathorn, she was trembling and hazy.

{¶5} After emergency medical services made sure that M.B. was okay, officers arrested her on an outstanding warrant. The officers also obtained a search warrant for the house based on what Officer Hackathorn saw while making a protective sweep of the floors. Following the search, the Grand Jury indicted Mr. Linder for aggravated possession of drugs, possession of drug paraphernalia, possessing drug abuse instruments, having weapons while under disability, unlawful possession of dangerous ordinance, and resisting arrest. Mr. Linder moved to suppress the items found during the search, arguing that Officer Hackathorn violated his constitutional rights when he entered his home without a warrant. Following a hearing, the trial court denied his motion, concluding that Officer Hackathorn had reasonable grounds to believe that an emergency existed and that immediate entry into the house was necessary to protect life and prevent serious injury. Mr. Linder subsequently pleaded no contest to several of the offenses. The trial court found him guilty of the offenses and sentenced him to nine months in jail. Mr. Linder has appealed, assigning as error that the trial court incorrectly denied his motion to suppress.

II.

ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE EVIDENCE FOUND AS A RESULT OF AN UNCONSTITUTIONAL WARRANTLESS SEARCH OF APPELLANT'S HOME.

**{¶6}** Mr. Linder argues that the trial court incorrectly denied his motion to suppress. A motion to suppress presents a mixed question of law and fact:

> When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

**{¶7}** "The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio Constitution prohibit the police from conducting unreasonable and warrantless searches and seizures." *State v. White*, 9th Dist. Lorain No. 11CA010005, 2011-Ohio-6748, ¶ 6. This Court, however, "has recognized several exceptions to the warrant requirement that justify a police officer's warrantless entry of a home." *State v. Cummings*, 9th Dist. Summit No. 20609, 2002 WL 57979, *4 (Jan. 16, 2002). "The first exception is an 'emergency situation,' which arises when someone in the home is in need of 'immediate aid' or there exists a situation 'threatening life or limb.'" *Id*., quoting *State v. Bowe*, 52 Ohio App.3d 112, 113-114 (9th Dist.1988). "The second exception is a search incident to a lawful arrest." *Id*. "The third exception is when the police are in 'hot pursuit' of a suspect who retreats into the confines of his home." *Id*., quoting *Bowe* at 113. "The fourth exception is for evidence that might easily be removed or destroyed if entry is delayed to obtain a warrant." *Id*. The "overarching principle" is that, "if there is a 'compelling need for official action and no time to secure a warrant,' the warrant requirement may be excused." *Missouri v. McNeely*, __ U.S. __, 133 S.Ct. 1552, 1570 (2013), quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978).

{¶8} At the suppression hearing, the State argued that the warrantless entry of Mr. Linder's house fell within the exigent circumstances exception, other times known as the community-caretaking exception. *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, ¶ 15. In *Dunn*, the Ohio Supreme Court explained that the exception exists because "police officers are duty-bound to provide emergency services to those who are in danger of physical harm[.]" *Id.* at ¶ 20. It "allows police officers to stop a person to render aid if they reasonably believe that there is an immediate need for their assistance to protect life or prevent serious injury." *Id.* at ¶ 22. The United States Supreme Court has also recognized the exception, explaining that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

{¶9} Officers do not need "ironclad proof" of a likely serious or life-threatening injury to invoke the emergency aid exception. *Dunn* at ¶ 19. Instead, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action." (Alteration in original). *Stuart* at 404, quoting *Scott v. United States*, 436 U.S. 128, 138 (1978). "The officer's subjective motivation is irrelevant." *Id.*

{¶10} Ohio courts have recognized that the "government has a legitimate interest in conducting a search of a residence when they are called to that residence as a result of the occupant * * * claiming that [s]he is suicidal and has access to weapons[.]" *State v. Bethel*, 5th Dist. Tuscarawas No. 10-AP-35, 2011-Ohio-3020, ¶ 21. "While suicide is not a crime, police officers have a duty to prevent citizens from harming themselves * * *." *State v. Neptune*, 4th Dist. Athens No. 99CA25, 2000 WL 502830, *5 (Apr. 21, 2000). The risk of suicide, however, must be "pronounced and immediate[.]" *United States v. Christy*, 810 F.Supp.2d 1219, 1268 (D.N.M.2011). Mere knowledge that a person is depressed, off her medication, and had

previously attempted suicide "is not an objectively reasonable basis that there was an *immediate* need to protect [the person] from herself." *Id*. "People who struggle with suicide and depression, and are not consistent with their medication, do not give up all rights to Fourth Amendment protection; the government still needs to secure a warrant unless the risk of harm to self is imminent or immediate." *Id*. at 1269.

{¶11} Upon review of the facts of this case, we conclude that exigent circumstances justified Officer Hackathorn's warrantless entry to the house. Although M.B. was allegedly seen walking around in the community earlier that day, Officer Hackathorn did not know whether that was before or after M.B. called J.S. to say that she was suicidal. By the time Officer Hackathorn reached M.B.'s location, at least several hours had passed. Officer Hackathorn had information that M.B. was addicted to heroin and that she had parked her car at a likely drug house. He also observed the reaction of the man who poked his head out of the side door of the house, who, upon seeing Officer Hackathorn, immediately retreated inside the house and locked the door, despite Officer Hackathorn's order to stop. At that point, it was reasonable for Officer Hackathorn, who was only at the residence to check on the welfare of M.B., to presume that he was not going to receive cooperation from the occupants of the house. Because time could be of the essence if M.B. had followed through on her suicidal thoughts, a reasonable officer could believe that he would not have time to obtain a warrant. *See State v. Croston*, 4th Dist. Athens No. 01CA22, 2001 WL 1346130, *3 (Oct. 30, 2001) (noting that "time is often of the essence in emergency situations."). Officer Hackathorn had also received information that J.S. had a reasonable belief that M.B. was in danger of self-inflicted harm.

{¶12} Officer Hackathorn did not need ironclad proof that M.B. had or was about to commit suicide for it to be reasonable for him to enter Mr. Linder's house without a warrant.

Although it is a close question, we conclude that the trial court correctly determined that he did not violate Mr. Linder's Fourth Amendment rights. Mr. Linder's assignment of error is overruled.

### III.

**{¶13}** The trial court did not err when it denied Mr. Linder's motion to suppress. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

MOORE, P. J.
CONCURS.

SCHAFER, J.
DISSENTING.

{¶14} We recently declared that "[t]he Fourth Amendment's protections are critical to the preservation of personal liberty as they are all that often stand between a citizen and the intrusive arm of government." *State v. Starr*, 9th Dist. Lorain No. 14CA010586, 2015-Ohio-2193, ¶ 11. I believe that to vindicate these protections, we should determine that the warrantless search of Linder's home was unreasonable and deprived him of his precious "right to be let alone" from governmental intrusion. *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting). Because the majority concludes otherwise, I must respectfully dissent.

**A.      The Fourth Amendment's Protection of the Home**

{¶15} The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" The framers of the Constitution included this provision "to protect against invasions of 'the sanctity of a man's home and the privacies of life' from search under indiscriminate, general authority." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 301 (1967), quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886). As Justice Potter Stewart put it, "The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). Because of the Fourth Amendment's centrality in our concept of liberty, it is a longstanding principle that "constitutional provisions for the security of person and property should be liberally construed." *Boyd* at 635. Due to the amendment's long history, a number of

principles are implicated when a criminal defendant claims that a search violated his right to be secure in his home. Those that are relevant, in my view, to the disposition of this matter are summarized below.

### 1. Warrantless Searches Are Presumptively Unreasonable

**{¶16}** The warrant requirement of the Fourth Amendment is "one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state, where they are the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948). As a result, it is a "cardinal principle that 'searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject to only a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978), quoting *Katz v. United States*, 389 U.S. 347 (1967). These exceptions are "jealously and carefully drawn," *Jones v. United States*, 357 U.S. 493, 499 (1958), and "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches," *Welsh v. Wisconsin*, 466 U.S. 740, 749-750 (1984).

### 2. Warrantless Searches of Homes Receive Particular Scrutiny

**{¶17}** These principles apply with particular force when assessing the constitutionality of searches within a private home. "Without question, the house is afforded the full range of Fourth Amendment protections." *Lewis v. United States*, 385 U.S. 206, 211 (1966). Courts recognize this special entitlement because "physical entry is the chief evil [to] which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court of E.Dist. of Mich., S.Div.*, 407 U.S. 297, 313 (1972). Accordingly, "[w]ith few exceptions, the question whether a warrantless search of a house is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001).

### 3. The Emergency-Aid Exception Is Narrowly Drawn

{¶18} The majority correctly points out that one recognized exception to the warrant requirement is the exigent circumstances exception, also called the community-caretaking/emergency-aid exception. *See* Majority Opinion at ¶ 12. However, it should be emphasized that this exception is "one of the lesser known" exceptions to the warrant requirement and "the doctrine's applicability has been far less clear in cases involving searches of the home." *Matalon v. Hynnes*, 806 F.3d 627, 634 (1st Cir.2015) (collecting cases where federal courts have been ambivalent towards extending the doctrine to warrantless searches of homes). When determining whether the State has carried its burden of proving the applicability of the exception, we should be mindful that "a warrantless search [on the basis of exigent circumstances] must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey* at 393, quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968). And, as is relevant to the circumstances of this matter, "[i]t is important to recognize that there is not a suicide exception to the warrant requirement; there is an exigent circumstances exception." *United States v. Christy*, 810 F.Supp.2d 1219, 1269 (D.N.M.2011).

### B. The Search of Linder's Home Violated the Fourth Amendment

{¶19} Applying these principles here, I cannot escape the conclusion that the State failed to overcome the presumption of unreasonableness that attaches to the warrantless searches of private homes. According to the evidence offered at the suppression hearing, at the time that Officer Hackathorn entered Linder's home by kicking the door down, he had received the following information:

(1) M.B. was "feeling suicidal lately" and had a history of heroin use and suicide attempts;

(2)      M.B. was walking around the neighborhood earlier in the day with two other individuals looking for a gas can;

(3)      M.B. skipped the arranged meeting with her father at the hospital;

(4)      M.B.'s vehicle was parked behind Linder's home but could have been parked for either of the adjoining houses; and

(5)      An unknown individual put one foot outside of the side door before seeing Officer Hackathorn and turning back inside.

I consider each of these circumstances below in turn.

{¶20} As to the first two circumstances, I note that M.B.'s history of suicide attempts has limited probative value regarding the degree of immediate danger in this matter. *See Christy*, 810 F.Supp.2d at 1268 ("The deputies' knowledge that K.Y. was depressed and off her medication, and that she had previously attempted suicide, is not an objectively reasonable basis that there was an *immediate* need to protect K.Y. from herself."). While M.B. did express suicidal ideation earlier that day, there was no definite threat of suicide communicated to Officer Hackathorn regarding the timing, location, or means of a potential suicide. The lack of a definite threat is particularly relevant here because Officer Hackathorn received information that M.B. was walking around the neighborhood with two others to find a gas can. Such information conveys that M.B. was ambulatory, not isolated, and acting in a way that was inconsistent with suicidal ideation.

{¶21} In regard to the third circumstance, there is no indication in the record why M.B. missed the meeting with her father at the hospital. Indeed, the circumstances were such that instead of jumping to the conclusion that M.B. must have been isolated and attempting suicide, it would have been reasonable to determine that there were a variety of possible explanations for

her absence. Since M.B. was walking around the neighborhood earlier with two others looking for a gas can, it could have been reasonably determined that M.B. had transportation issues that day. Or, it could have reasonably been determined that as a heroin user, M.B. second-guessed the decision to seek medical treatment. To discount these two alternative explanations for M.B.'s absence and latch onto the potential ongoing suicide rationale "was wholly speculative" and cannot provide a constitutional basis for a finding of exigency. *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, ¶ 51 (2d Dist.) (determining that no exigent circumstances existed to support warrantless search for missing firearm since the State's asserted basis for the exigency was "wholly speculative").

{¶22} Based on the first three circumstances, I cannot see that there was a reasonable basis to conclude that M.B. was at imminent risk of suicide when Officer Hackathorn arrived at Linder's home. And, neither the fourth nor the fifth circumstance could have reasonably changed that calculus after Officer Hackathorn reached the home. In fact, those two circumstances had limited bearing on whether M.B. was even at the home. Although her car was parked behind the house, Officer Hackathorn acknowledged that he had no direct knowledge that M.B. was there. He also acknowledged that the car could have been parked for either of the two adjoining houses. Officer Hackathorn testified that he did not know who the individual was that looked outside the side door, so he could not connect that individual with M.B. Before kicking the door down, neither Officer Hackathorn nor his partner talked to anybody at the house regarding M.B. or her health. They had no indication that guns were in the house, that any threat existed to the community, or that M.B. was at imminent risk of suicide.

{¶23} Because I cannot find that these circumstances objectively support a finding of exigency, I believe we should look to Officer Hackathorn's testimony regarding his basis for

knocking the door down. *See State v. Kramer*, 315 Wis.2d 414, 431 (2009) ("[W]hen a search or seizure is not supported by probable cause or reasonable suspicion and it is contended that the reasonableness of police conduct stands on other footing, an officer's subjective motivation is a factor that may warrant consideration."). The officer testified as follows:

> Well, based on the information from [M.B.'s] father * * *, he believed she would kill herself and that she had made attempts to in the past, the call to him, and once the same location where there is possible drug activity, and then when somebody sees the police and then runs inside when I say, "Stop," *that tells me that there's probably something bad inside happening* or could have already happened. So I felt [M.B.]'s well-being, her safety was in jeopardy at that point, and we couldn't wait to get a search warrant.

(Emphasis added.) This testimony reflects that there was a "hunch" that something was amiss at the house and that that hunch, rather than an objective consideration of the circumstances, gave rise to the forcible warrantless entry into Linder's home. Such a basis does not bring this matter under the ambit of the emergency-aid exception to the warrant requirement. *See United States v. McClain*, 444 F.3d 556, 564 (6th Cir.2005) ("Such compelling reasons cannot be established under the facts of this case where officers who were not faced with an emergency situation, however good their intentions, only had an unparticularized hunch that a crime was being committed inside [the defendant]'s home).

### C.     Ohio Precedent Supports Suppression

{¶24} Comparing the facts of this matter with the Ohio Supreme Court's recent guidance on the emergency-aid exception in *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, further bolsters my conclusion that the warrantless search violated Linder's constitutional rights. There, the Court approved a warrantless search of an *automobile* where "officers received a dispatch regarding an allegedly armed and suicidal person with an imminent plan to kill himself upon reaching a destination." *Id*. at ¶ 23.     Conversely, in this matter, the officers

searched a *home* that belonged to someone other than the person they were checking on. *Compare id.* (noting that "stopping a person on the street is 'considerably less intrusive than police entry into the home itself'"), quoting *Illinois v. McArthur*, 531 U.S. 326, 336 (2001). There was no report of M.B. being armed. There was no report that M.B. had an imminent plan to kill herself. And, there was no report that M.B. was going to kill herself at a certain destination. Because the Court in *Dunn* emphasized each of these items from the police dispatch and that the matter involved a traffic stop, I conclude that the lack of the same items here compels the opposite result: a determination that the emergency-aid exception does not apply to the warrantless search of Linder's home. *Compare also State v. Bethel*, 5th Dist. Tuscarawas No. 10-AP-35, 2011-Ohio-3020, ¶ 31 (determining that exigent circumstances justified warrantless search of home where "police had been told that [the defendant] had weapons and wished to harm others"); *State v. Neptune*, 4th Dist. Athens No. 99CA25, 2000 WL 502830, *1, *5 (Apr. 21, 2000) (determining that exigent circumstances justified warrantless search where police only entered the home after the defendant herself told police that she would kill herself, the police confirmed that the residence was the defendant's home, and the police had a conversation with her through the front door when officers saw her inside swinging a knife before entering the home); *State v. Oliver*, 91 Ohio App.3d 607, 610 (9th Dist.1993) (determining that police had "reasonable cause [to believe] that [the defendant] was in need of immediate assistance to protect his life" since he had threatened suicide, was distraught, intoxicated, and had two guns "ready to go").

{¶25} I share in Officer Hackathorn's concern for M.B.'s life, especially within the context of the heroin epidemic. "[B]ut those concerns must rise to the level of a reasonable belief that someone in the residence [was] in need of immediate aid[.]" *State v. Hendrix*, 9th

Dist. Summit No. 27217, 2014-Ohio-3577, ¶ 13. The record in this matter does not contain facts creating such a reasonable belief. And, I worry that to approve of the search in this matter, we could potentially transform the "emergency-aid exception" into the "suicide exception" whereby any police action done to check the welfare of a potentially suicidal person receives constitutional sanction.

{¶26} In sum, to give effect to the critical protections of the Fourth Amendment and the principles that protect our liberty and our homes, I believe that we should resolve this matter's "close question" in favor of the individual whose home was violated. I would accordingly sustain Linder's assignment of error and reverse the trial court's judgment. Since the majority does otherwise, I respectfully dissent.


APPEARANCES:

JEFFREY N. JAMES, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and KASSIM J. AHMED, Assistant Prosecuting Attorney, for Appellee.