[Cite as *State v. Keating*, 2020-Ohio-2770.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2019-08-064 |
| Appellant, | : | O P I N I O N<br>5/4/2020 |
| | : | |
| - vs - | : | |
| | : | |
| ALLISON KEATING, | : | |
| Appellee. | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2018CR00576


D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas A. Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellant

W. Stephen Haynes, Clermont County Public Defender, Robert F. Benintendi, 302 East Main Street, Batavia, Ohio 45103, for appellee


**M. POWELL, J.**

{¶ 1} Appellant, the state of Ohio, appeals a decision of the Clermont County Court of Common Pleas granting the motion to suppress of appellee, Allison Keating.

{¶ 2} On February 18, 2018, Miami Township Police Officer Todd Taylor was dispatched to a McDonald's restaurant to conduct a welfare check on the female passenger

of a gold Caravan. The police had received a call indicating that the passenger had open sores on her arms and was wearing bloody gloves. Officer Taylor and another police officer, Sergeant Hirsch, responded to the scene in separate police cruisers. The officers located the van and approached it. Upon contacting the driver and discovering that the subject of the welfare check was not in the van, Officer Taylor indicated his intention to go into the store, a gas station, and look for the woman. Sergeant Hirsch remained outside.

{¶ 3} Upon entering the store, Officer Taylor immediately observed a woman with multiple bleeding sores on her arms. The woman was Keating. Officer Taylor approached her and explained why he was there. Keating explained that her sores were caused by impetigo, a skin condition, and that she was okay. Keating did not ask for assistance and Officer Taylor did not call for medical assistance. The officer asked Keating for identification. Keating replied she did not have any identification on her and instead verbally provided her social security number. Officer Taylor and Keating subsequently exited the store and returned to the van.

{¶ 4} Testimony differs as to what occurred once Keating provided her social security number to Officer Taylor. Keating testified that after she provided her social security number to Officer Taylor, he told her, "I could get back in the van. He'd be just a minute or whatever. And he took my Social Security number and ran it." Officer Taylor testified that as he "was out with [Keating]," he called the Clermont County Communication Center to run a warrant check on Keating using her social security number. The officer could not remember if Keating was in the van at that point or standing just outside the vehicle. He, however, denied directing her to get into the van. Officer Taylor was never asked whether he told Keating "he'd be just a minute."

{¶ 5} The dispatcher informed Officer Taylor that there was a warrant for Keating's arrest. Subsequently, the officer advised Keating of the warrant. Keating was in the

passenger seat of the van at that time. Keating asked if she could smoke a cigarette. Officer Taylor replied that she could if she promised not to run off. The officer then asked Keating "if she had anything illegal on her that could get her in trouble." Keating disclosed there was a syringe in her backpack. The dispatcher subsequently confirmed the warrant. Officer Taylor handcuffed Keating and asked her if he could retrieve the syringe from her backpack. Keating acquiesced and further asked the officer to retrieve some money from her backpack. While doing so, Officer Taylor observed a folded piece of paper and inquired about its contents. Keating admitted it contained heroin.

{¶ 6} Testimony reveals that throughout the events, Sergeant Hirsch remained outside, near or on the driver's side of the van. Testimony further indicates that after Keating provided her social security number to Officer Taylor, and while the officer spoke with Keating on the passenger side of the van, Sergeant Hirsch was on the other side of the van speaking with the driver.

{¶ 7} Keating was indicted on one count of heroin possession. She moved to suppress the evidence, arguing that she was unlawfully detained once Officer Taylor told her she "could get back in the van. He'd be just a minute." The trial court conducted a hearing on the matter; Officer Taylor and Keating both testified. Five weeks after the suppression hearing, the state filed a memorandum in opposition to Keating's motion to suppress, asserting that there was no seizure and implicitly arguing that the officer's interaction with Keating was a consensual encounter until the officer discovered Keating's arrest warrant.

{¶ 8} On August 5, 2019, the trial court granted Keating's motion to suppress. The trial court found that while the initial encounter between Keating and Officer Taylor was consensual, the officer's statement to Keating "he'd be just a minute," combined with the presence of two police officers at the scene transformed the encounter into an investigatory

detention without a reasonable, articulable suspicion of criminal activity. The trial court reasoned that "Officer Taylor's words and the presence of multiple police officers were enough to make a reasonable person in the defendant's shoes feel that she would not be free to leave and ignore Officer Taylor's implied request. As such, the defendant was illegally detained at that moment." In so ruling, the trial court found Keating's "testimony that Officer Taylor told her 'he'd be just a minute' credible," but acknowledged "that Officer Taylor did not testify that he told [Keating] she 'could get back in the van' or that 'he'd be just a minute.'"

{¶ 9} The state appeals the decision of the trial court, raising one assignment of error:

{¶ 10} THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION TO SUPPRESS.

{¶ 11} The state argues that the trial court erred in granting the motion to suppress. Specifically, the state asserts that Officer Taylor's interaction with Keating was a consensual encounter that did not implicate the Fourth Amendment until the officer told Keating there was an active warrant for her arrest. The state further asserts that even if Keating was illegally detained, the heroin should not have been suppressed because its discovery did not arise from the illegal detention but rather, arose due to an intervening circumstance and/or independent source, namely, Officer Taylor's discovery of the arrest warrant.

{¶ 12} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 8, citing *State v. Burnside*, 100 Ohio St. 3d 152, 2003-Ohio-5372, ¶ 8. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence in order to resolve factual questions and evaluate witness credibility. *Vaughn* at ¶ 8. In turn, when reviewing a trial court's decision on a motion to suppress, an

- 4 -

appellate court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard. *Id.*

{¶ 13} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *State v. Brown*, 12th Dist. Clermont No. CA2001-04-047, 2001 Ohio App. LEXIS 5476, *5 (Dec. 10, 2001). However, not all interactions between police officers and citizens are seizures under the Fourth Amendment. *Id.* The United States Supreme Court has recognized three categories of police interactions with members of the public: (1) a consensual encounter, which requires no objective justification, (2) a brief investigatory detention, which must be supported by reasonable suspicion of criminal activity, and (3) a full arrest, which must be supported by probable cause. *State v. Wynne*, 10th Dist. Franklin No. 18AP-531, 2019-Ohio-1013, ¶ 12. The state did not argue in the trial court that the encounter between Officer Taylor and Keating was anything other than a consensual encounter that did not implicate the Fourth Amendment. A consensual encounter occurs "where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away." *State v. Tabler*, 10th Dist. Franklin No. 14AP-386, 2015-Ohio-2651, ¶ 21.

{¶ 14} In determining whether an encounter between a police officer and a citizen is a seizure and thus implicates the Fourth Amendment, the question is whether, in light of all the circumstances surrounding the encounter, a reasonable person would believe he or she was not free to leave. *Wynne* at ¶ 13. Stated otherwise, the question is whether, taking into account all the circumstances surrounding the encounter, a reasonable person would

feel free to decline the officer's request or terminate the encounter. *Brown* at *5-6, citing *Florida v. Bostic*, 501 U.S. 429, 436-437, 111 S.Ct. 2382 (1991). As long as a reasonable person would feel free to disregard the officer, the encounter is consensual and no reasonable suspicion is required. *Bostic* at 434. "Under this objective test, we consider not whether the individual believed he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Columbus v. Body*, 10th Dist. Franklin No. 11AP-609, 2012-Ohio-379, ¶ 14. Circumstances indicating that a person has been seized include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, and blocking the person's path. *Brown* at *6, citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980); *Wynne* at ¶ 13.

{¶ 15} We recently addressed a similar situation to the case at bar in *State v. Kirk*, 12th Dist. Clermont No. CA2019-07-053, 2020-Ohio-323. While on routine patrol, a police officer came upon Kirk who was attaching a band saw to the front of his bicycle near the loading area of a store. Upon inquiry, Kirk told the officer he did not have any identification on him and instead verbally provided his name and social security number. The officer told Kirk, "I'll be back with [you] in a minute," then proceeded to his cruiser where he ran Kirk's personal information through LEADS. Within a couple of minutes, the officer learned that Kirk was subject to an extradition warrant. The officer returned to Kirk, advised him of the warrant, and informed him that he was going to pat him down and secure him. Before the officer could do so, Kirk fled. The officer caught Kirk and placed him under arrest. In searching Kirk incident to the arrest, the officer discovered drugs on Kirk's person.

{¶ 16} Kirk moved to suppress the evidence, arguing that he was unlawfully detained once the officer told him, "I'll be back with [you] in a minute." In opposing Kirk's motion to

suppress, the state argued that the officer's interaction with Kirk was a consensual encounter until the officer discovered Kirk's arrest warrant. The trial court granted Kirk's motion to suppress. The trial court found that while the initial encounter between Kirk and the officer was consensual, it evolved into an investigatory detention without a reasonable, articulable suspicion of criminal activity when the officer told Kirk, "I'll be back with [you] in a minute." The trial court reasoned that the officer's "words alone were enough to make a reasonable person in the defendant's shoes feel that he would not be free to walk away and ignore [the officer's] implied request. As such, the defendant was illegally detained at that moment." *Id.* at ¶ 5.

{¶ 17} On appeal, we reversed the trial court's grant of the motion to suppress. Based upon the totality of the circumstances surrounding the officer's interaction with Kirk, we found that "the interaction was a consensual encounter until the officer told Kirk he was going to pat him down. In other words, [the officer's] statement to Kirk, 'I'll be back with [you] in a minute,' did not constitute a seizure of Kirk implicating the Fourth Amendment and requiring reasonable suspicion." *Kirk*, 2020-Ohio-323 at ¶ 21. Hence, we found that the officer's statement to Kirk, "I'll be back with [you] in a minute," did not convert the encounter from a consensual one to an investigatory detention, and thus the trial court erred in granting Kirk's motion to suppress. *Id.* at ¶ 24.

{¶ 18} Pertinent to our holding were the fact that the officer was the only officer at the scene, the officer did not advise Kirk that he was returning to his police cruiser to use Kirk's identifying information to check for warrants, and Kirk could have walked or pedaled away from the encounter at any time before he was informed he would be pat down. *Id.* at ¶ 22-23.

{¶ 19} Turning to the case at bar, we consider whether, in light of all the circumstances surrounding Officer Taylor's interaction with Keating, the officer's words and

actions would have conveyed to a reasonable person that he or she was free to leave or otherwise terminate the encounter. *Body*, 2012-Ohio-379 at ¶ 14. Based upon the totality of the circumstances surrounding Officer Taylor's interaction with Keating, we find that while the initial encounter was consensual, it evolved into an investigatory detention without a reasonable, articulable suspicion of criminal activity when the officer told Keating that she "could get back in the van. He'd be just a minute."

{¶ 20} Similar to *Kirk*, many of the factors evidencing a seizure were absent. The sirens and light bar of Officer Taylor's cruiser were not activated when the officer pulled up to the scene or afterwards. There is no evidence Officer Taylor drew or displayed his weapon, touched Keating, or accused her of a crime. Although he could not recall where he had parked his cruiser, Officer Taylor did not believe it blocked the van's path.

{¶ 21} However, unlike in *Kirk*, Keating was not a pedestrian free to walk away, but rather was a passenger in the van dependent on the van's driver. Unlike in *Kirk*, Officer Taylor was not the only officer at the scene. Rather, there were two officers at the scene, and both responded to the scene in separate police cruisers. During the entire time Officer Taylor interacted with Keating, Sergeant Hirsch remained on the driver's side of the van speaking with the driver. Unlike in *Kirk*, Keating knew Officer Taylor was conducting a warrant check as he called the Clermont County Communication Center in her presence. Furthermore, Officer Taylor's statement to Keating that she "could get back in the van. He'd be just a minute," conveyed a sense he was in charge of Keating's movements. Finally, the warrant check occurred while Officer Taylor and Sergeant Hirsch surrounded the van.

{¶ 22} In light of all of the circumstances surrounding the encounter between Officer Taylor and Keating, we find that the officer's statement and actions, combined with the presence of Officer Taylor and Sergeant Hirsch on both sides of the van, thereby surrounding it, would have communicated to a reasonable person that he or she was not

free to walk away or otherwise terminate the encounter. We therefore find that Keating was seized within the meaning of the Fourth Amendment when Officer Taylor advised her she "could get back in the van. He'd be a minute." Because the encounter between Officer Taylor and Keating escalated from a consensual one into an investigatory detention before the officer learned about the arrest warrant, the trial court did not err in granting Keating's motion to suppress.

{¶ 23} Citing numerous cases, the dissent maintains that police officers may constitutionally detain individuals absent suspicion of criminal activity to ensure the individual's well-being. Although the state did not argue that Keating's detention was justified pursuant to this community caretaking function, the dissent relies upon *State v. Peagler*, 76 Ohio St. 3d 496 (1996), to assert that we should reverse the trial court's grant of the motion to suppress on the ground Keating's detention was a reasonable detention incident to the exercise of Officer Taylor's community caretaking duties. Alternatively, the dissent relies on *Peagler* to assert we should order that the issue be briefed by the parties. *Peagler* recognized the discretionary authority of a court of appeals "to address an issue not briefed or raised below [so long as there is a] sufficient evidentiary basis in the record * * * upon which it can decide a particular legal issue." *Peagler* at 499.

{¶ 24} In reviewing the record to determine whether there is some evidentiary basis to justify resolving this case upon a legal theory not advanced below, we must be cognizant of the burdens of production and proof in proceedings upon motions to suppress. This case involves a warrantless seizure of the person. In such cases, it is the state which bears the burdens of production and proof. *See State v. Denune*, 82 Ohio App.3d 497, 505 (12th Dist.1992). Thus, if the record is ambiguous or lacking upon an issue for which the state bears the burden of production and proof, that ambiguity or omission must be resolved against the state.

- 9 -

{¶ 25} The record reflects that upon first being approached by Officer Taylor as she stood in line in the store, Keating explained the sores on her arms and told Officer Taylor that she was "ok." Based upon Keating's response, and apparently satisfied that Keating was not in need of further attention, Officer Taylor did not call for medical assistance.[1] Officer Taylor then asked Keating for her identification; she replied that she had none but provided the information verbally. Keating's replies to Officer Taylor's inquiries were responsive and appropriate. Officer Taylor testified that Keating was free to leave at the time he asked her for identification, again indicating he had no concerns for her well-being. Keating exited the store with Officer Taylor without assistance. There is nothing in the record regarding this interaction between Keating and Officer Taylor to suggest that Keating was in some acute distress. Finally, Officer Taylor's testimony refutes any implication that checking Keating's identification information was related to the initial "welfare check." Upon cross-examination, Officer Taylor rejected defense counsel's suggestion that he called in Keating's identifying information to complete his report and testified that he did so to check for warrants.[2] This record discloses that Keating was detained for purposes of criminal investigation, not for her own welfare. Under *Peagler*, there is no evidentiary basis for us to consider whether Keating's detention was an exercise of community caretaking or order additional briefing of the issue.

{¶ 26} We decline to address the state's argument regarding whether the trial court's suppression of the heroin was the proper remedy. The state did not make this argument either in its memorandum in opposition to Keating's motion to suppress or during the

---

1. When asked on cross-examination if he sought medical assistance for Keating, Officer Taylor testified, "No. Once she explained what the sores were for – or, the reasoning for them, no. * * * Then she indicated she was okay."

2. On cross-examination, defense counsel asked Officer Taylor if he contacted dispatch for the purpose of completing his report. Officer Taylor replied, "No. I was checking for warrants."

suppression hearing. In fact, at the beginning of the suppression hearing, the prosecutor plainly advised the trial court, "since [Keating's] issue is detention without a warrant, * * * we would proceed just to counter that." The state now suggests it could not have known this would be an issue it needed to raise until the trial court failed to correctly apply the law. However, contrary to the state's assertion, this issue was one that was identifiable as a ground to deny the motion to suppress, either from Keating's motion to suppress or from defense counsel's statement during his cross-examination of Officer Taylor, "And then, Judge, just so we cover the poisonous fruit argument that I'm going to have."

{¶ 27} It is well established that a party cannot raise new issues or legal theories for the first time on appeal because such issues or theories are deemed waived. *Kirk*, 2020-Ohio-323 at ¶ 25; *State v. Mehta*, 12th Dist. Butler Nos. CA2000-11-232 and CA2000-12-256, 2001 Ohio App. LEXIS 3896, *8 (Sept. 4, 2001); *State v. Walker*, 1st Dist. Hamilton No. C-150757, 2017-Ohio-9255, ¶ 26. This waiver "applies to arguments not asserted either in a written motion to suppress or at the suppression hearing." *Walker* at ¶ 26; *Vaughn*, 2015-Ohio-828; *State v. Clay*, 8th Dist. Cuyahoga No. 91942, 2009-Ohio-2725.

{¶ 28} The state's assignment of error is overruled.

{¶ 29} Judgment affirmed.

HENDRICKSON, P.J., concurs separately.

PIPER, J., dissents.

**HENDRICKSON, P.J., concurring separately.**

{¶ 30} I concur in the majority opinion but write separately to address the distinguishing circumstances between the case sub judice and this court's prior decision in *State v. Kirk*, 12th Dist. Clermont No. CA2019-07-053, 2020-Ohio-323. In my view, the

main distinction between the cases is that *Kirk* involved a legitimate *Terry* stop, whereas the circumstances in the present case did not. In *Kirk*, the police officer personally observed the defendant attaching a power tool to the front of his bicycle, which was extremely unusual. The defendant was in the parking lot of a retail store, near the store's dumpster. The defendant provided a suspicious explanation as to how he acquired the power tool. Given these facts, the police officer had reasonable and articulable suspicion for a *Terry* stop in order to determine whether the tool was stolen. As the officer in *Kirk* had authority to continue his investigation based upon a reasonable and articulable suspicion of criminal activity, the case turned on whether there was a valid *Terry* stop and not whether the encounter was consensual. To that extent, I agree with the concurring opinion in *Kirk*.

{¶ 31} However, circumstances like those in *Kirk* are not present in the case before us. Unlike in *Kirk*, whether the encounter was consensual is relevant in this case as there are not facts giving rise to a valid *Terry* stop. Officer Taylor did not have reasonable articulable suspicion that Keating was involved in any criminal activity. Although Officer Taylor testified at the hearing on the motion to suppress that the bloody sores observed on Keating's arms were "an indicator for drug use, meth" and Keating appeared to have "bags under her eyes or dark circles under her eyes," these facts were not what led him to ask for Keating's personal information or into running an outstanding warrants check. Rather than associating any suspected drug usage to the likelihood that users typically have outstanding warrants, Officer Taylor indicated he ran Keating's information for an investigatory reason – "to check for warrants." As Officer Taylor explained, he is not required to check for outstanding warrants on all individuals that he comes into contact with on his police calls. Rather, the Miami Township Police Department only requires officers "take a report on every call for service. So to do that, we have to detail the individual's name and the reason for the contact."

{¶ 32} When Officer Taylor made contact with Keating, Keating gave a reasonable explanation for why she had blood sores on her arms – she had impetigo. Officer Taylor admitted he was not familiar with impetigo, stating, "I didn't know what it was but apparently it was the reason for the sores she had." Nonetheless, Officer Taylor determined Keating did not need medical aid, and at this point in time, the welfare check was over.[3] Thereafter, Keating briefly engaged in a consensual encounter with Officer Taylor, providing him with her name and social security number. However, the consensual encounter ended when Officer Taylor told Keating to "get back in the van. He'd just be a minute[.]" When this occurred, the encounter became nonconsensual, as fully laid out in the majority opinion. Officer Taylor's ongoing investigation of Keating was improper without the officer having reasonable and articulable suspicion of criminal activity. As none existed, Keating was illegally detained in violation of her Fourth Amendment rights. I therefore concur in the majority's determination that the motion to suppress was properly granted. I further concur with the majority's findings that (1) the state's second issue under its assigned error is not properly before this court as it was not raised below and (2) there is no evidentiary basis in the record below for us to consider the application of *State v. Peagler*, 76 Ohio St.3d 496 (1996).

---

3. I recognize that "[t]he community caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows police officers to stop a person to render aid if they reasonably believe that there is an immediate need for their assistance to protect life or prevent serious injury." *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, syllabus. While this exception allowed Officer Taylor to approach Keating to ensure she was fine medically and did not need assistance, the exception did not permit him to detain Keating after he ensured her health and safety. The caretaking/emergency-aid exception only permits "police to respond to situations where life or limb [are] in jeopardy." *Id.* at ¶ 21. As discussed in the majority opinion, Keating assured Officer Taylor she was "ok" and that the blood sores were caused by impetigo. At this point, there was no threat to Keating's life or limbs, as evidenced by the fact that Officer Taylor did not call for medical assistance. The nature of Officer Taylor's interaction with Keating changed, and, as discussed above, he lacked reasonable and articulable suspicion and did not have cause to detain Keating.

**PIPER, J., dissenting.**

{¶ 33}   Respectfully, I dissent from the lead and separately concurring opinions in affirming the trial court's determination that the welfare check resulted in an "illegal detention."  The trial court's analysis failed to consider the law regarding welfare checks, as do my colleagues.  A detention is only illegal if it is found to be unreasonable.  It is not unreasonable if the factual circumstances support application of an exception to the requirement of a warrant.  The idea that we cannot apply law that clearly governs the circumstances ultimately works injustice upon a system designed to do the opposite.

{¶ 34}  The motion to suppress raises the issue of the reasonableness of Keating's welfare check.  In conflating the law applicable to a welfare check, Keating argues "even a momentary detention" must be supported by a suspicion of criminal activity.  Keating argues that as a matter of law once a person who is the subject of a welfare check explains his or her condition, law enforcement must immediately terminate any concern for the individual.  Accepting this proposition of law means law enforcement cannot take the time necessary to ascertain the totality of the circumstances.  Such a proposition of law would also mean law enforcement could never conclude a contact by verifying the person's identity who was the subject of their welfare check.  Neither my colleagues, the trial court, nor Keating's motion cite caselaw that a limited detention cannot occur in the process of a welfare check. None exists.

{¶ 35}  As raised in Keating's motion to suppress, once she became subject to a brief and limited detention, it must then be determined whether Keating's Fourth Amendment rights were violated.  The question becomes: was Keating *unreasonably* detained under a totality of the circumstances, and therefore *illegally* detained as a matter of law, by an officer who was confirming her identity in order to conclude his welfare contact?  Stated differently, as a matter of law is a brief detention to confirm a person's identity who is the subject of a

- 14 -

welfare check beyond the scope of the community caretaking function? Since the community caretaking function does not afront the Fourth Amendment, these questions must be answered in the negative.

{¶ 36} The fact that the state was overly optimistic and responded to the issues raised in Keating's motion in a limited way does not alter the need to fully apply widely accepted case law. Evidence cannot be suppressed unless it can be said that Keating's Fourth Amendment rights were violated. Determining whether an initial engagement is consensual is the beginning of the legal analysis, it is not the *end* of the legal analysis.

## A. The Circumstances Specific to Keating

{¶ 37} During the suppression hearing, the officer testified to receiving a dispatch that requested a welfare check on a female passenger who was bloodied in a van with another person. The officer was given specific information, including the location of the van in a McDonald's parking lot along with its license plate number. The dispatch described the female passenger as having "open wounds" on her arms and wearing bloody gloves. After arriving at the location, one of the officers located the female inside a nearby store. The officer testified that upon approaching the female, he immediately inquired if she was "okay" and explained that they had received a request to perform a welfare check on her. The female then gave the officer an explanation, which he considered uncertain considering his experience and her appearance. Despite Keating's explanation, the officer testified he still had concerns for her safety and welfare.[4]

{¶ 38} The officer testified that from his experience, the bleeding appeared to be drug related. He further indicated the female appeared to be "not well, bags under her eyes or

---

4. My colleagues find the officer did not have continuing concerns for Keating's welfare, yet, this was not a finding made by the trial court. To find such, despite the officer's testimony to the contrary, requires a credibility determination best left to the trial court. Similarly, the trial court never made a finding that Keating's explanation was "reasonable" despite the *weight* attributed to her explanation by the concurring opinion.

dark circles under her eyes, appeared to be not feeling well." In concluding his inquiry into her well-being, the officer asked the female for identification and she replied that she had none. The female then volunteered a social security number, presumably to confirm the name she gave. Then the officer called it in to dispatch. By this time, they had walked out of the store to the van.[5]

{¶ 39} It was determined by the trial court that the officer contacted dispatch to confirm her identity to complete his contact and conduct a check for warrants. Using the social security number, dispatch confirmed Keating's identity but also reported an outstanding warrant for Keating's arrest. In giving Keating the benefit of the doubt, the officer asked dispatch to verify that the warrant was still active. The officer testified with certainty it was only at this point, waiting for the reported warrant to be verified as active, that Keating was instructed not to leave. Although Keating testified, she never testified she felt she could not leave prior to this time.

{¶ 40} Despite the officer never being cross-examined on the subject, the trial court found Keating's self-serving statement as reliable. The trial court found that the officer told Keating he would be back in a minute because when Keating was asked to provide as much detail as possible, she testified that either she asked him, or he told her, she could get into the van and "he'd be just a minute *or whatever.*" Even using the trial court's factual finding that the officer told Keating it would take a minute, any detention was brief, limited in scope, and does not alter the legal application of the community caretaking function. Unlike my colleagues, the trial court never found the momentary detention was unrelated to the welfare

---

5. Testimony revealed that it was standard procedure for an officer to "take a report on every call for service" and "detail the individual's name and the reasoning for the contact." Despite the trial court's finding, the lead opinion finds the sole reason for asking Keating to wait a minute while he confirmed the social security number she gave was for a warrant check constituting a "criminal investigation." Yet, the trial court specifically found a person's identity is "information in every incident report."

check, nor did the trial court find that confirming Keating's identity was unreasonable in following through on the social security number Keating volunteered.[6]

**B. Community Caretaking**

{¶ 41} The United States and Ohio Supreme Courts have long held that an officer performing community caretaking functions reasonably engages a person when necessary to offer assistance. When discussing law enforcement duties and safety issues pertaining to the public, the community caretaking function has been referenced by different names, including welfare check, public welfare, emergency-aid, and exigent circumstance. "In their community caretaking roles, officers may intrude on a person's privacy to carry out community-caretaking functions to enhance public safety." *State v. Street*, 5th Dist. Stark Nos. 2019CA00096 and 2019CA00097, 2020-Ohio-173, ¶ 22 (where the court also noted, "the key to such permissible police action is the reasonableness required by the Fourth Amendment"). This is because, at such a time, the officer may be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal statutes." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523 (1973). *See also State v. Morris*, 42 Ohio St.2d 307 (1975).

{¶ 42} When officers focus on providing care and possible aid to persons, officers are not required to possess reasonable suspicion of criminal activity. *State v. Norman*, 136 Ohio App.3d 46 (3d Dist.1999). Given their community caretaking duties, officers frequently investigate a myriad of instances where individuals may need help or care absent any indication of criminal activity. *State v. Weese*, 10th Dist. Franklin No. 12AP-949, 2013-Ohio-4056. These instances include responding to vehicle accidents, helping stranded motorists, or providing aid to incapacitated individuals. *See State v. Chrzanowski*, 180 Ohio

---

6. The trial court made a specific finding of fact Keating volunteered her social security number for the officer.

App.3d 324, 2008-Ohio-6993 (11th Dist.); and *Street*, 2020-Ohio-173. Thus, police officers may, "intrude on a person's privacy to carry out community caretaking functions to enhance public safety." *State v. Telshaw*, 195 Ohio App.3d 596, 2011-Ohio-3373, ¶ 30 (7th Dist.).

{¶ 43} Despite the narrow interpretation in both the foregoing opinions regarding when the community caretaking function is applicable, *any* serious accident, injury, jeopardy to persons, or public safety may initiate law enforcement's duty to serve and protect. Merely because "acute distress" was not immediately observed by the officer does not mean the law requires a welfare check to terminate. To require such would vitiate the very purpose of the community caretaking function. *State v. Moiduddin*, 3d Dist. Union No. 14-18-15, 2019-Ohio-3544, ¶ 34 (explaining that situations that might not fit under the emergency aid or exigent circumstances may nevertheless fit under another facet of the community caretaking function); and *Street*, 2020-Ohio-173 (even where there was no actual injury observed, the dispatch relayed a citizen report that an individual may have been in need of assistance).

{¶ 44} In *Moiduddin*, the trial court suppressed evidence where an officer pulled over a car because it was driving too slowly, finding that the stop was not within the officer's community caretaking function because a slow-moving vehicle did "not require immediate need for assistance to prevent death or serious injury." However, the Third District found that the officer was within his community caretaking function to stop and inquire of the driver as part of his "legitimate role as a public servant designed to assist those in distress and to maintain and foster public safety." ¶ 40.

{¶ 45} Even so, the bounds of an officer's ability to respond pursuant to the community caretaking function are not limitless and the officer must possess "objectively reasonable grounds to believe" that there is a need for aid. *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, ¶ 21. In *Dunn*, it was noted that law enforcement has a duty to

protect those in danger. Dunn, who reportedly was suicidal, had his truck stopped by police. He exited his vehicle and was detained, but subsequently charged with improper handling of a firearm in a motor vehicle because a gun was located in the truck.

{¶ 46} So long as the officer is acting with reasonable grounds to believe his or her aid is necessary, the Fourth Amendment is neither implicated nor violated by an officer investigating safety concerns. *State v. Clapper*, 9th Dist. Medina No. 11CA0031-M, 2012-Ohio-1382. *See State v. Saunders*, 5th Dist. Muskingum No. CT2017-0052, 2018-Ohio-2624, ¶ 25 (finding an encounter reasonable where the officer was "clearly in the scope of his duties in making a 'welfare check' on someone walking in a staggering fashion on a public street at 1:15 AM"). It is not speculation, but empirical knowledge that informs us if an intoxicated person who disavows his or her condition and then walks out into traffic and is killed because the officer failed to take a moment to access the person's condition, a civil suit against the officer will almost certainly follow.

{¶ 47} In *State v Johnson*, 12th Dist. Clermont No. CA99-06-01, 2000 Ohio App LEXIS 1870, *10 (May 1, 2000), we noted an individual may be temporarily restrained for his own safety. We explained that this is especially proper where the apparent detention is either made clear, or simply obvious, that the detention is to be brief and in public. Johnson was not illegally seized when briefly detained, first, to provide for Johnson's safety and to secondly ascertain why he was dressed inappropriately for mid-winter freezing temperatures, walking dangerously close to traffic and in the vicinity of a burning car. Even before *Dunn, w*e recognized an officer's responsibility to aid a member of the public may require a brief detention.

{¶ 48} In the present case, the record clearly indicates that the officers were dispatched in response to a request for a welfare check based on a reported observation of a bloodied woman in a van in the McDonald's parking lot. The officers responded to

perform a community caretaking function and not because an actual crime had been reported.[7]  The officer's unrefuted testimony established that the woman, subsequently identified as Keating, needed a welfare check.  If nothing else, her being bloodied and acting ill required a brief detention in an attempt to comprehend the circumstances and determine what, if any, assistance should be rendered.  At the very least, concluding a welfare check by confirming the subject's identity is reasonable and not "illegal" as a matter of law.  It is only prudent to spend a few minutes with an apparently ill individual, and in that process, find out who they are.  Such is certainly within the purpose and scope of a welfare check.[8]

### C. Not Always Bright Line Between Caretaking and Investigation

{¶ 49} In fact, officers may encounter many different situations where a momentary detention is necessary to survey the circumstances.  *See Johnson*, 12th Dist. Clermont No. CA99-06-061 at *10, *State v. Valenzuela-Pena*, 12th Dist. Madison No. CA2018-07-023, 2019-Ohio-1701 ¶19 (where a package was not seized but rather detained and we emphasized the need to consider the purposes to be served by the encounter as well as the time reasonably needed to effectuate those purposes).

{¶ 50} Courts have noted investigating criminal activity can overlap an officer's role in providing a community care taking function.  *State v Young*, 10th Dist. Franklin No. 14AP-721, 2015-Ohio-2006, ¶ 34.  An officer cannot always ascertain which hat the officer will be wearing – his law enforcement hat (involving investigation) or his community caretaker hat (involving assistance or aid).  *Moiduddin*, 2019-Ohio 3544 at ¶ 40.  Facts supporting a

---

7.  Objectively, it cannot be denied that a reasonable probability existed that a person reported to be wearing bloody gloves and bleeding with "wounds" is either a victim or a perpetrator of some sort of serious violence or accident.  The potential seriousness of what was to be discovered supported two cars being dispatched to the scene.

8. Besides being a natural conclusion to an incident they were sent to respond to, law enforcement's confirmation of a person's identity potentially aids in the need for further protection; an individual bleeding and appearing ill could be, among many other things, a walkaway Alzheimer's patient, one with mental health care concerns, a reported missing person, or a reported victim of various crimes – in other words individuals who do not always report accurately to police, yet need assistance.

welfare check may also form a reasonable, articulable suspicion providing a basis for a *Terry* stop. *State v. Saunders*, 5th Dist. Muskingum No. CT2017-0052, 2018-Ohio-2624 ¶ 28.

{¶ 51} There is nothing per se unconstitutional in the brief detention of an individual for purposes of limited inquiry during routine police response, even when the circumstances are not such as to justify an arrest. *State v. Kolb*, 12th Dist. Warren No. 11, 1982 Ohio App. LEXIS 14365, *4 (Jan. 20, 1982). Officers do not need ironclad proof as to the seriousness of injury before responding to a potential need. *State v Lindner*, 9th Dist. Summit No. 27788, 2016-Ohio-3435. Instead, officers need only to possess a "reasonable basis." *State v. Wade*, 5th Dist. Muskingum Nos. CT2019-0007 and CT2019-0008, 2019-Ohio-4565, ¶ 22. It appears the officers were well within the caretaking function when they responded to the McDonald's parking lot and assessed the situation, which included identifying the subject involved. Unfortunately, sub judice, the trial court granted suppression merely upon a factual determination a momentary detention had occurred and then automatically held as a matter of law it was an "illegal detention" without further analysis.

{¶ 52} The officer briefly engaged the subject to ensure she was alright, and in doing so, was proceeding to conclude matters by confirming her identity. The focus should be upon the reasonableness of the detention and the limit to its scope. *See Valenzuela-Pena*, 2019-Ohio-1701 at ¶ 19. The trial court did not make a factual finding that confirming the subject's identity was unreasonable. Instead, it drew a legal conclusion it was "illegal." Yet, the detention was very limited in scope and duration. The momentary detainment even allowed Keating the opportunity to smoke a cigarette when she agreed not to leave. Even with the trial court's finding, she was told it would take a minute, confirming the social security number she provided was clearly within the purpose and scope of the initial welfare inquiry.

{¶ 53} While the officer's wellness check was intended to conclude by verifying her identity, the brief detention for purposes of completing the officer's contact was entirely reasonable and does not render the momentary detention violative of Keating's rights pursuant to protections otherwise provided by the Fourth Amendment.

### D. Issues Raised Below by the Evidence

{¶ 54} Our lead opinion claims the evidence does not support the notion that Keating's momentary detention was associated with her welfare check. Then, it claims "waiver" to support its decision that a party's written argument submitted to the trial court controls whether the officers were acting pursuant to their community caretaking function.[9] However, the prosecutor's choice to focus on the encounter as entirely consensual cannot ignore the fact that, in her motion, Keating submitted that the basis of suppression was the momentary detention associated with her welfare check.

{¶ 55} The preference would have been that this court ask the parties to brief issues related to the application of the community caretaking function before entering our judgment. *State v. Peagler*, 76 Ohio St.3d 496 (1996). In *Peagler*, the Ohio Supreme Court referenced this specific preference by noting, "this court has often held that if a reviewing court chooses to consider an issue not suggested by the parties on appeal but implicated by evidence in the record, the court of appeals should give the parties notice of its intention and an opportunity to brief the issue." *Id*. at fn. 2.

{¶ 56} The *Peagler* court was presented with a situation where the appellate court addressed issues regarding an appellant's motion to suppress that were different from that argued to the trial court. The Ohio Supreme Court determined that an appellate court has

---

9. Our appellate review is obligated to accept the trial court's determination of facts, resolving all factual questions. *State v. Lynn*, 12th Dist. Butler Nos. CA2017-08-129 and CA2017-08-132, 2018-Ohio-3335. Appellate review is limited to applying the law to the facts as determined by the trial court.

discretion "in deciding to address an issue not briefed or raised below" so long as the appellate court bases any factual conclusions or legal issues on evidence that exists in the record at the time the trial court made its decision. The court went on to state,

> fairness, which is required for the proper operation of the adversary system of justice, requires at least that the parties be allowed in the trial court the opportunity to present evidence that would support or refute the legal theory addressed by the court of appeals. We therefore hold that while an appellate court may decide an issue on grounds different from those determined by the trial court, the evidentiary basis upon which the court of appeals decides a legal issue must have been adduced before the trial court and have been made a part of the record thereof.

*Id.* at 501. While I respect the opinions of my colleagues, they give weight to only portions of the testimony in order to draw the conclusion the momentary detention was unassociated with the community caretaking function.

{¶ 57} My conclusions are entirely based upon the trial court's findings of fact and undisputed testimony. I draw an opposite legal conclusion and determine we would be better to implement the preference for fairness and request the parties brief the law applicable to the totality of the circumstances. It is only an alternative to their view of the legal conclusion to be reached from the evidence that my colleagues' opinions argue "waiver."

{¶ 58} Even so, the facts and circumstances attendant to the momentary detention associated with the welfare check were not newly raised as my colleagues determine. In order to determine whether Fourth Amendment protections were violated, it was the trial court's obligation, and ours as well, to analyze the nature of the encounter, including whether the detention was unreasonable. The basic constitutional principles raised in Keating's pleadings must be *fully* considered to ensure the integrity of sound criminal proceedings.

{¶ 59} It behooves us to remember that a party's waiver requires the "intentional

relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770 (1993) (explaining that reviewing courts have discretion to correct error affecting the fairness and integrity of judicial proceedings). Rather than being applicable to arguments made by the parties, waiver is generally applied to personal, individual rights accorded an accused. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041 (1973). The application of waiver to the evidence before us is the anthesis of applying *Peagler*.

{¶ 60} Perhaps the state's limitation of its argument is better characterized as a "forfeiture." Yet, forfeiture does not extinguish an error. *Olano.* Where a party has forfeited an objection by failing to raise it, the appellate court may still review the issue using a plain error standard. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642. In contrast to waiver, forfeiture is the failure to object or make an assertion where the party complaining of the trial court's error did not call the error to the trial court's attention at a time when such error could have been avoided. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459 ¶ 21 (no argument was made to seek merger of allied offenses of similar import and was thus forfeited before the trial court, yet such was plain error on appellate review).

### E. Conclusion

{¶ 61} Regardless of the prosecutor's decision to limit the state's argument to consensual contact, the community caretaking function permits officers to initiate a brief detention without running afoul of the Fourth Amendment. Both parties and the trial court were aware of the facts elicited during the suppression hearing, which enabled the trial court to properly perform the necessary Fourth Amendment analysis in its entirety.

{¶ 62} The opinions of my colleagues extrapolate from isolated portions of testimony to envision a factual construct permitting them to dismiss the significance of *State v. Peagler*. Simultaneously, this disallows the possibility for a reasonable conclusion to a welfare check, which was merely confirming the reported subject's identity to complete the

contact report. There is no doubt both Keating's motion and the testimony submitted raise the issue of the reasonableness of the community welfare function.

{¶ 63} Suppression of evidence by virtue of the Exclusionary Rule is a judicially created remedy designed to safeguard Fourth Amendment rights through its deterrent effect upon government officials and law enforcement. *State v. Mobley*, 12th Dist. Warren No. CA88-08-063, 1989 Ohio App. LEXIS 1878 (May 22, 1989). Attempting to deter officers from verifying or confirming a person's identity while conducting a welfare check should not be the subject of judicial fiat when considering the exercise of reasonable discretion needed by police officers protecting individuals on a daily basis.

{¶ 64} The record is clear; the officers were dispatched to investigate a bloodied woman, encountered that woman, and then reasonably detained her for a very short time while concluding her welfare check. I therefore find Keating's Fourth Amendment rights were not violated when applying the community caretaking function to the facts as determined by the trial court. As such, I respectfully dissent from the lead and separately concurring opinions, which affirm the trial court's suppression of evidence. I would reverse the trial court's suppression of evidence and remand for further proceedings.